Council, whenever you're ready. Thank you. Good morning, Your Honors. My name is Ronald Schiller, and I represent Darwin, and I'm here to discuss why, on de novo review, the decision of the District Court on summary judgment should be reversed. There are actually just two—oh, and I'd like to reserve four minutes for rebuttal. I'll try and help you. Thank you, Your Honor. There are actually about four major issues here, and I'm saying four, not the seven or eight that we listed, because they apply equally to Callaway and Ameritax, which were the two underlying lawsuits. So I'm going to deal with them together. There are two that I'd like to put off, unless Your Honors have questions on them, and they're the termination and bad faith issues. By termination, I mean the termination of the duty to defend if the Court agrees there was one, and bad faith meaning if there was a duty to defend, whether or not there should have been a trial on bad faith. Let me just ask you one question in terms of status. Have new state actions been initiated in light of the Eleventh Circuit's ruling? Not to our knowledge, and we have searched the records. And served with any— No, we have not. And to be clear, because the basis for the reversal was lack of federal jurisdiction, they would be filed in individual state courts. And so it requires us to— I'm just wondering whether— There has been no tender. There has been no follow-up. There has been no attempt to say, for the same reason, you have to defend these new Emeritus suits. For that reason, the judgment by the Middle District of Florida has been vacated and is no longer in force, in effect. That's correct. And it would require Emeritus to bring new suits in state courts, which to our knowledge it hasn't, and we haven't heard from them. Same counsel represented them on the tender letter, in the trial court, and here. So they may have a different answer. Go ahead on the point you'd like to argue. Sure. That's okay. So I'd like to argue two points, Your Honors. One is the disparagement issue. And secondly, the prior notice claims issue. And one is a contractual requirement, the prior notice claim exclusion. And the other is what Swift Distribution calls the intersection of First Amendment law, disparagement law, and contractual and insurance coverage law. And so I'm going to spend most of my time, Your Honors permitting, on the disparagement issue. The disparagement issue, to be clear, has two parts to it. One is whether or not there was a statement that met the Swift test, which is the Supreme Court of California test, for actionable disparagement. And the other is whether or not if there wasn't such a statement in the Third Amendment complaint in Ameritax, we, the insurer, Darwin, were charged with duty to go out and ferret out information that Millennium says would establish it. I would like you to address, under the prior notice claims issue, how this could be a prior notice claim if the price presentation didn't occur until January or February of 2012. Why don't I start with that then? Because I think that that's a pretty discreet issue and was an independent basis for judgment that we lost. The prior notice claims exclusion says, as respects all insuring agreements. So it applies to every insuring agreement in the policy, which means both the GL or general liability, which includes advertising injury, which is what we're here talking about today, as well as claims relating to other kinds of coverages, like claims made coverages. And there's no question that it begins with, as respects all insuring agreements. Now, it goes on, Your Honors, to say, as respect to all insuring agreements, this policy shall not apply to any claim. And there's no question here that the only thing covered is a claim, which is a defined term in the policy. To any claim. The claim would be disparagement, right? No. The claim is defined to be. From prices comments? I don't think that. Well, if they had a claim, they would say it was a new disparagement claim. You're right. In the Third Amendment complaint. And if that were true, and the statement was not made until January or February, why would that fall within this prior notice claims exclusion issue? Because it's not prior. Because what this says is, to any claim, based on, or in any way involving, and in insurance coverage law, and we cited this in the brief, that's about as broad language as you can get. It doesn't say causally connected. It was part of an occurrence policy, wasn't it? This section was part of an occurrence. Yeah. You're right. Doesn't it seem like there's sort of a mismatch here? Like this prior claims notion seems like it would usually go more with a claims policy than an occurrence policy. And we've got this overlay here. Can you point us to a case that melded these concepts together in the way that you're saying they should be melded together in this policy? Well, first off, Your Honor, and I think we did cite cases that say that prior knowledge and prior claims, even in an occurrence policy, apply. But more important, Your Honor, and first to answer Judge Tallman's question, and then to get to your question, the second line of that very exclusion says, in any way involving suits. It has a whole list. But one of the items on that, it says suits. Right. But I mean, if a new occurrence happens and they amend the prior suit, you're saying that under an occurrence policy, a new occurrence that leads to new claims in an existing suit wouldn't be covered? That seems like a counterintuitive reading. That's correct, Your Honor. Under a literal reading of queer language, what it says is- Can you point us to a case that has applied such a clause in that way? Because if you have cited it, I didn't see one that was like that. No, I can't. Nor can they point you to a case that has said that this doesn't get applied. And to be clear, Your Honor- It seems counterintuitive, Mr. Shiller. I mean, let's assume that there had not been any litigation at all up until these statements were made in 2012, and then the claim is tendered. Clearly, that would be a tender of a claim of disparagement arising from the price presentation. And your argument seems to be that by filing suit earlier, where there is no claim of disparagement, that any suit somehow immunizes the insurer from a subsequent new occurrence giving rise to a covered claim. I just think that's a stretch. Can I tell you why it makes sense? Yeah, yeah. First off, it's the clear language, and there's been no successful attack or even preserved attack from below that it's ambiguous, it should be reformed, or it's against public policy. It's almost akin to a release, a waiver and release of claims in a settlement agreement that I hereby now and forever release any current, present, and future known and unknown causes of action that I might have against the party I'm settling with. I don't read the involvement of any suits that broadly, and if that's your position, I don't think that's clear at all in the language of the law. Well, first off, Your Honor, they didn't even argue ambiguity until for the first time in this appeal, and they cited no case law for the proposition that this language is unambiguous. And this language has been applied in the claims made context, but Your Honors, the reported to any policy of insurance in effect prior to the inception date of the policy, so there's no question that as applied to the facts in this case, both of these actions had been reported to Travelers and Chubb, and more important, Your Honors, because this takes care of the apparent unfairness, which was their argument in the trial court. Their argument was this is unfair in this context, except in this context, these suits had been going on forever. Putting aside the issue of whether or not Paragraph 28 in the Ameritax matter were the Callaway answers, were a disparagement claim, they weren't. But putting aside those issues, if they were, which is the assumption I'm working on with your questions, this is not the case to say that they're unfair because they had – Maybe this gets to your disparagement argument, but why would not statements by the general counsel of the company that the competitors are engaged in illegal practices, that they have to be under a DOJ compliance regime, that they're selling bad science to the doctors because these test kits don't really do what they're promising the doctors are going to do? Why isn't that disparagement? To me, that seems to be pretty clear, at least giving rise to a potential for coverage under a disparagement. Two answers to that, Your Honor. First, those statements were never tendered to us. And remember I said there are two parts to our disparagement claim. One is, is the language disparaging under the law? And the other is, was it tendered? Did we have a duty to know about it? But your adjuster had the Paragraph 28 of the Third Amendment complaint. No. Paragraph 28. And I want to step back practical two for a second. There are two things here. There's the Ameritax and the Callaway. Callaway was never amended. It was the same counterclaim as before our policy incepted. But the Callaway comes from discovery, right? That's correct. And it came from discovery. And the discovery alleged that there was disparagement, right? As to events that occurred in the prior, in what they were suing about in the counterclaim. They have never contended. When I look at the response, though, it doesn't cite dates. So how do we know that it's all in the past? Because the only new thing that referred to, the only new thing that referred, that they referred to to tender to us, as well as Travelers and Chubb on Callaway and Ameritax, was the Paragraph 28 reference. Everything else tied directly to what was already at litigation. But this goes more directly to Judge Tallman's question. We did not, and I'm sorry if our brief wasn't clear enough. We did not have the speaking notes or talking points. We did not have the details. Right. No, I understand that you didn't have the speaking notes, but you had a Callaway discovery response that alleged disparagement. You had a complaint in another competitor's case saying disparagement. You had a lot of things in your files suggesting that there might be a disparagement claim even if it was only vague in this amended paragraph. So why aren't you supposed to figure out, well, maybe there's disparagement here? Except we have two different claims. And what happens in Callaway is not something that you can connect necessarily to why Ameritax is suing. And this has a practical difference, a distinction. We learned on the eve of trial in the case below that what was left in Callaway, their whole claim against us, was $4,500. $4,500. They had total defense costs of $900,000, and Chubb and Travelers Why does that tell us whether it was disparagement or not? My point is, the reason it's relevant is that was a separate claim, Your Honor, and it had nothing to do with the $25 million demand for defense costs in Ameritax. So that if, and we knew it had already been tendered to other insurers, and this is the point, Your Honor, SWIFT was decided three weeks after we lost summary judgment on a decision that discussed why we lost it in two paragraphs. And I think it's important to put that into perspective. At the summary judgment hearing, we got, for the very first time, in connection with that hearing on our summary judgment, we got the so-called talking points in this case, and we got But I don't think you need the talking points. It seems like when you looked at the information you had about this company, people are making allegations that they're disparaging their competitors. And if you looked at all your files, you probably could have guessed that that might happen. Now, it might not, but there's a possibility of disparagement. Well, and that's where I respectfully disagree for two reasons, Your Honor. One, that's not what SWIFT distribution said. And so the first thing we did Well, what about SWIFT is inconsistent with the idea that you should generously look at the information you have to see whether there's a potential claim? Because SWIFT was concerned, the Supreme Court of California was concerned, and I'm almost down to two minutes, so with Your Honor's I'm trying to get a word in edgewise to let you know the clock is running. Well, SWIFT distribution was concerned with where First Amendment and disparagement law intersect. And it said, A claim of disparagement requires a plaintiff to show a false or misleading statement specifically referring to the plaintiff's products or business, clearly derogating that product or business. Each requirement must be satisfied by express mention or clear implication. Clear implication means a necessary inference. What in the Callaway discovery response was insufficient to meet those criteria? There was nothing in the Callaway discovery response that made clear that even Callaway was bringing a disparagement claim. There was nothing that said It said that your client was, or sorry, that the insured was making false statements about their products. I mean, it met, as far as I can tell, met these criteria. Well, it's also, Your Honor, it flies directly in the face of Gundersen, Bach, Microtech. And I'm not sure if we cited Microtech, but it's cited by the other cases that we discussed. All of those, and Microtech, oh, and Total Call. And Total Call was the decision we argued to the trial judge, says that you don't take into account extrinsic evidence or take into account whether there could be a disparagement claim. You look at what was actually pled. Read paragraph 28. Paragraph 28 says, We will destroy our competitor at any cost, more or less. It uses a body bag implication, a gunshot wound. It doesn't say in paragraph 28 in the Ameritox complaint, and we're going to do that because their products stink. And that's what that, and Microtech says there's a good reason for that. It may be they don't want to bring a disparagement claim. The fact that one may exist, and I really do want to save a minute. Well, then you better end your sentence. Okay. I'll stop now. Thank you, Your Honor. Thank you, Mr. Halpern. Good morning, Your Honors. Mark Halpern for Millennium. Where I'd like to start, because the Court started with the prior notice exclusion, was a misstatement of the record by opposing counsel where, I'm not sure it's needed, but he stated just a moment ago that we did not preserve ambiguity. And on page 18 of our motion for summary judgment, there's a section titled, at the very least, the exclusion is ambiguous. We did raise that issue. With respect to the prior notice exclusion, the Court seems to be fathoming the very important standard here that exclusions are to be narrowly construed, and we're talking about a potential for coverage standard for the duty to defend. And the cases cited by counsel, as the Court points out, all concern claims made coverage, and typically concern a very different type of exclusion, actually a prior litigation exclusion. Here we have a prior notice exclusion, but even the cases that they cite to, interestingly enough, in reviewing them for the hearing, themselves even go through for that different type of insuring provision, still go through an analysis of what the actual acts or offenses were and whether they relate to each other. And in a duty to defend standard, you don't go to the merits if there's an allegation that some claims may relate. So we cited to endurance on that, and there's a number of other cases on that. So the key fact here, of course, is that the PowerPoint presentation did not exist. It did not take place. The statements in there did not take place until the Darwin policy period, and we don't have coverage for that under the prior policies. It's a discreet event, and sufficiently discreet, that Emeritoc saw fit to amend its complaint specifically to address the possible disparagement allegations arising from that complaint. And I think the next part of the analysis would be to just look at the policy language, and as we pointed out in the briefs, the very insuring agreements of the occurrence policy provisions. So the insuring agreement pertaining to personal and advertising injury is keyed, once again, to the specific offense. So it provides coverage as a result of a claim alleging personal or advertising injury caused by an offense that takes place during the policy period. So the trial court got it exactly, district court got it exactly right, that this was a potentially discreet claim triggering coverage. And the other part of the policy that would be inconsistent with their reasoning, or another part, would be the fact that this is, it's not a prior litigation exclusion, once again. It's an exclusion where if we provided notice to this other insurer previously, then somehow coverage would be eviscerated. And that's inconsistent with the other provisions in this policy. There's a clause, a subrogation clause, for example, that requires us to preserve Darwin's rights against third parties, and that includes insurers. Their claims, it's in the record, their claims adjust, they're testified, that one of the requirements of that condition is that we have given notice of other parts of these lawsuits to the other insurers, so that they could... It may very well be that Travelers was on the hook for that part of the case that arose during its policy period, but now Darwin has to step up and contribute to the costs of defense because now there is a new claim within its policy period that triggers its obligation to defend. That is exactly right, Your Honor. And under the law of California, once a policy is triggered, it has to provide defense coverage for the entire claim. And the way... And then the two insurance companies can fight it out with one another as to what percentage of the defense costs each will contribute. Exactly. And that's in fact why per-occurrence coverage exists. It's a way for insurers to share the risk of defending the case. And then, of course, if there's a judgment or a settlement, then you go to the merits of what parts of the liability pertain to which policies. So say we agree with you that the exclusion isn't a problem for you. You still have to show that there is a potential claim for disparagement here, and it's a little troubling that the notes weren't produced with the tender. So can you speak to why that was the case? Sure, Your Honor. And I will say that on that point, SWIFT is actually a fantastic case for us, and I'll try to stick to the record, but I believe it's in their trial that Millennium believed that the complaints themselves, the discovery responses, was easily sufficient under the law to trigger the duty to defend. And the way it works is that's typically what you provide. Insurance policies say, give us the complaint. And the expectation is if they want anything more, then they ask for it. And in fact, the tender letters end with the line, if you need anything else, just give us a call. Travelers, another insurer, they tendered to Darwin as well to share in the defense when this PowerPoint issue came up. We didn't even know about that at first. But they did the same thing. So even an insurer recognized that standard, and Judge Huff and Judge Beauchamp recognized that standard as well. So I don't think we were in the wrong not to provide the notes. There was a sensitivity there. Is your position that the, I think it's paragraph 28, itself alleges disparagement, or just that it alerts the insurer to the potential for disparagement? Because I think it's a pretty hard argument that under SWIFT, it alleges disparagement in and of itself. Well, I think it rises to the level that it raises the potential for disparagement. And just to talk about SWIFT for a moment, Your Honor, before I leave it on the point of the extrinsic evidence, SWIFT makes clear, and Judge Beauchamp picked up on this, that an insurer can't just deny coverage if they're on notice that there's another pertinent document out there. That is imputed to the insurer. And the case of SWIFT, the court mentions that, look, the policyholder had this sales catalog. And regardless of whether the insurer asked for it, that was available. And so that becomes part of the analysis as well. So the notes do become part of the analysis, according to the California Supreme Court. But the insurer didn't know there were notes at that point, right? There may or may not be notes that go with a PowerPoint. It turns out there were, but nothing in the complaint said, and we know from the notes, or something like that, that would have told them to ask for this specific document, right? Oh, well, Your Honor, first of all, it was obvious that the PowerPoint was the centerpiece of what we were talking about. We mentioned it in the tender. And a PowerPoint, in and of itself, inherently, consists of slides and talking points, and Well, maybe, maybe not. I mean, I've certainly prepared one where I didn't have any talking points. I just talked off the slides. Well, certainly, they could have, at a minimum, asked for us to tell them what was in there. It was our general counsel. Well, your point is that they didn't conduct any investigation at all beyond simply receiving whatever you sent them in the mail. That's what Judge Bichonte found as an evidentiary matter. That's what the jury essentially concluded, I assume. In finding bad faith. But to your point, Judge Friedland, actually, there was testimony in the record by their claims adjuster, who, as a person most knowledgeable, who said, I understand that a PowerPoint includes slides. I understand it includes notes. At a minimum, they should have asked for it, is the point. And then they would have gotten it. What happened instead was that they placed themselves in an adverse position to us by denying coverage. And it came out later that, basically, they decided that, and this was in the trial record, they basically decided that they were just going to deny coverage. And this was a highly- They also said, you can give us any other information. I mean, both sides were kind of blaming the other for not asking for more information, right? So, or for not providing more information. When they denied coverage, why didn't you send the notes? Because at that point, they put themselves in an adverse position to us. This is not just any document, I will say. This document was being sought aggressively in discovery by Ameritox in the underlying case, and there was a fight going on about whether it should be produced or in what redacted form or whatnot. I believe it's in the record that if they had asked for it, they would have gotten it. But instead- But not without a fight, because you were claiming, what, work product or- No, I think if they had put themselves, instead of in an adverse position to us, if they put on our side and said, hey, look, we just want to learn a little bit more about the PowerPoint, then tell us about it, and we think there's coverage there. Now, I don't think they need the notes in order for us to establish coverage, but at a bare minimum, they were on notice that there should be more out there that they should have looked into. And that's what Judge Schott found. That's what- And I think the quote- Am I correct that in terms of timing, once you received Darwin's letter denying coverage, you filed suit within a month of the receipt of that letter? That's correct. And I believe it's somewhere in the record. If it's not, I apologize. But we were actually in coverage litigation with them or their parent company regarding another policy at the time. And so it became clear immediately, based on the fact they didn't ask for anything, that they were putting themselves in an adverse position and were either going to sue us or we'd have to sue them. I mean, it was a point of great frustration for Millennium and for travelers, frankly. And I will say it's interesting course of conduct evidence. This plays to both the PowerPoint issue and the exclusion. It so happens. But there are other cases where there was less money at stake, Zakari and Universal Oral Fluids, where we- the travelers was providing a defense. And in Zakari, in that case, the PowerPoint issue and a disparagement claim came in. And we tendered to Darwin. And Darwin said, okay, we'll provide a defense subject to a reservation of rights. And we understand travelers is defending. And for, you know, we're only on the hook for the portion that concerns occurrences during our policy period, namely the PowerPoint. We'll split defense 50-50. And that's in the record of the Zakari case. So this is a completely- what was the difference between this case and Zakari and Universal Oral Fluids? In this case, it was $15 million of defense. It was a big case. And the PowerPoint was a huge centerpiece of it. And it was being heavily litigated. With respect to this, I just want to talk about SWIFT for a moment more, if the court has interest. Because I think that on the disparagement criteria, that Darwin is really significantly over-extrapolating the holding of that case. I think it's a great case for us and a great case for policyholders. And the issue there, the court doesn't set up some extreme standard where you have to provide infinite detail regarding a particular statement and against the product and what that product was. I think everyone would agree, the Supreme Court, of course, would agree that if you said something, your pleading is as simple as, look, they said defamatory things about our business or products. And that would qualify as- But it has to be false, right? And the description of the PowerPoint didn't describe anything that would be false. It was just like, you know, put them in body bags. That's not really a true or false type of statement, is it? The- SWIFT does not require that falsity be pled. And in fact, there's other California law on that issue. I'm not sure we cited to it in our briefs, but there was a meta-analytics case, for example, recently. That was 2016 Westlaw 687976, where, you know, the court addressed that exact point. You don't need to specifically plead falsity, just that you're- the SWIFT test, once again, was- part one was that you identify the companies you're talking about, either implicitly or expressly, and that happened here. Callaway and Ameritox were called out, and their products were called out. And then you have to say something that implicitly or expressly can be seen as derogatory. And- Well, even what- putting them in body bags, what's derogatory then? Well, that alone, it's a close call, I think. And I think about the- for example, the court case that they cited, I think it's CORT, where there was a mural, for example, and the mural was painted over. And the court said, just whitewashing a mural doesn't count as a potentially derogatory statement towards someone or something. But if they had altered the mural, I thought this was interesting, the court says that if they had altered the mural or changed it in some way, then maybe that's a statement about the other side. So, I don't know, maybe a picture would meet that criteria. But more importantly- Counselor? I'm not sure this is relevant to anything, but was the death of the compliance officer simply, you know, doing it in bad taste, or was it just the timing of it was- Well, we're not hanging our hats on the- just the body bag picture. And that- But somebody had died, right? Was it the compliance officer of the company? I apologize if I'm incorrect. I don't think that's correct. I think it was a picture of the competitor, it showed a picture of a body bag with the competitor with a toe tag that said Ameritox on it, or Callaway on it. I don't think there was an actual death of anyone involved, as far as I'm aware. If there was, I apologize. Maybe I misunderstood the briefing, I thought there was some reference in the record to the fact that, at the same time, a compliance officer for one of the companies- I guess that might have been even poorer taste, but- That was how I- I don't think that's- That's how I read it. I don't think that's what it was, but- Well, I'm sure Mr. Schiller will help me on that when he gets back. But there were- Could I ask you- Yes. We're about to run out of time. Sure. For the duty to defend once the Ameritox claim is on appeal, isn't it clear once the trial is over, there's no disparagement claim? I don't really understand why the appeal, at that point, required a duty to defend. Right. And that also was a closed call, and we cite to the Pritchard case, which basically says you look at the particular circumstances at the time- But what circumstance left a claim in a case that didn't have that claim by that point? That's a good question, Your Honor. At the time they filed their motion, there was actually a motion for new trial pending. But if there had been a new trial granted, couldn't you have filed a claim for coverage at that point? I don't understand why they have to cover the appeal in the meantime, where that's not a very likely outcome anyway. This was pre-appeal. So pre-appeal, at the end, there was an initial verdict, and there were pending motions for new trial. At that point, Darwin moved to terminate the duty to defend, and we told the court, look, there's pending motions for a new trial. This isn't even up on appeal yet. The whole thing could be re-litigated, for all we know. And the court agreed. They might have had an argument if they filed a new motion at the time of the appeal to say, look, now there was no new trial granted. The appeal doesn't include anything relevant. So now the defense terminates. And they probably would have had a good argument. The Pritchard case we cite was the exact circumstances we have here. Just procedurally, all that Darwin is appealing from is the motion where they had moved at the time of the first verdict, where there were still new trial motions pending at that moment, pre-appeal. So you say the dispute is whether they had to defend the motion for new trial, and they say the issue is whether you had to defend the appeal? I mean, is there a mismatch about what you guys think is at issue with that part of this case? There may be. They had only asked for that, and then there was a motion for reconsideration, I believe, they filed. They had only asked the trial court to terminate the duty to defend at the end of the first – when there was the first verdict rendered that did not include disparagement. And we said, at that point, there were motions for new trial pending. Look at the Pritchard case. That's not appropriate. They did not ask for it to be terminated later. Was it your motion for new trial? In the underlying case, I believe so. So at that point, is there any reason to think if you had won that motion that they would change what they were asking for? I mean, by that point, the whole trial had happened, and there was no disparagement claim. They might have very well changed their strategy. The PowerPoint came up at trial. So, I mean, the strategy in the underlying case was a moving animal. I think it's somewhere in the record the belief was that at any point they may pursue a direct disparagement claim because they had focused so much on the PowerPoint in the underlying case. So if a new trial was granted – I guess I just don't understand why if they did that, you couldn't file a claim then. It seems so unlikely that a case that didn't have a disparagement claim and has finished, really, is going to suddenly have a disparagement claim that they need to keep defending it at that point because of some tiny possibility that could trigger a new claim if it happened. I'll see if I can answer in five seconds. I think that the court got it correct that the time the new trial motion was pending because the PowerPoint had been such an issue that, just like in Pritchard, you look at the particular circumstances, that was not good enough. I think that it could have been terminated at the end of the – when the new trial motions were denied, but they didn't ask for that. And then, at that point, we would have re-tendered if the cases were re-filed in the state courts. Okay. Thank you. I think we have your position. Thank you very much. We actually filed a supplemental brief in the trial court after the verdict, after the 50 or 60 special verdict questions were answered, saying to the judge, obviously, no disparagement claim. And by the way, Ameritax wasn't appealing. They were. There was no disparagement claim. Secondly, Your Honors, Gunderson, Microtech, Bach, all say we're entitled to rely on what we're aware of, as well as what's in the pleadings that are sent to us, not to do an investigation in this situation. And it's important to realize these cases had gone on for a long time. They gave us what they wanted us to have. When we asked them in discovery, please give us whatever else in this case you think proves your coverage, they refused to give us the PowerPoint presentation. Do you think that you didn't have the obligation to look at all your files for this insured? Because they had other litigations, all of which, I mean, some of which you knew about, where there were disparagement claims, or at least you thought there might be. And then there are things that get close to disparagement claims, at least in this case, and it's like you're blind to the other stuff you know. Is that your position, that you're allowed to just put that to the side? No. But first off, Your Honor, those are different claims, different time periods, not disparagement claims. Zakari, UOFL, these were not disparagement claims arising out of the PowerPoint presentation. And that's why even Judge Bichon did not let them come. It's not even about the PowerPoint presentation, but didn't they allege disparagement? So you might think, oh, this is a company that seems like they're disparaging their competitors. No. What we knew about this was that this was a company that was in litigation all over the country, usually suing their competitors, sometimes being sued on counterclaims, and had been dealing with their prior insurers. And our coverage, and this goes back to the claims made issue two, was not replacing exactly what they had before. And their general counsel knew it. He had negotiated it with a large broker. It had exclusions. It had different coverages to protect the company. So we didn't have an obligation to try to figure out whether coverage claims being defended by travelers and chub and others might trigger something here where we thought it all related to the prior litigation. And it was all prior, Your Honor. Can I just touch on? I'll give you another minute. You're already a minute in. I realize. But I let Mr. Halpern run over, so go ahead. Thank you very much, Your Honor. Microtech. Microtech is a case that from, I think it's 1994, Your Honor, Ninth Circuit, in which the court goes through an advertising injury disparagement claim and actually says there was evidence of a disparagement claim, but the plaintiff suing Microtech had good reasons perhaps for not bringing it. And that gets to the other issue, Your Honor. It's a very practical, but it's set forth in Microtech, and it's also set forth in SWIFT Distribution in the narrowing language, because SWIFT Distribution took the line of cases that narrowed what could be a supportable disparagement claim in the coverage context. And by the way, the product catalog was actually referenced in the complaint in SWIFT Distribution. There were no notes referenced in this complaint. But in any event, in Microtech, the court said, sure, there was a disparagement potential claim, but for whatever reason, the underlying plaintiff may not have wanted to have brought it. Here, the same thing. If it turns out that some extrinsic evidence that Your Honor is referring to might have necessary inference, and that's the language it uses, it's almost a clear and convincing standard that SWIFT sets forth to identify the product, identify the customer, and have a false statement of fact that puts it in a derogatory way, and this is about disparaging a product, good, or service, which Paragraph 28 doesn't do. The necessary inference must be tied to a claim. And Americox never brought that claim and had good reasons not to. SWIFT also says, look at the whole complaint. It was a 209-paragraph complaint. Two hundred and nine paragraphs did not set forth a disparagement claim. It all related to witness intimidation. The PowerPoint in your law makes clear that you're looking at a potential claim, not an actual claim, right? Yes, but it requires that at least the facts be there. I mean, it doesn't come from extrinsic evidence. It doesn't have to be specifically listed as a claim in the complaint. But what Microtech, Bach, and Gunderson say, Your Honor, and Gunderson's a pellet California case, where, I mean, those were cases where there was, in one case it was a carport, in another it was an easement, and Bach was a good one because in Bach, which we repeatedly cited to the trial court but to no avail, the court said, the Ninth Circuit said, where the insurer, I think it was Travers, said, we see no coverage, but we want you to tell us if we're wrong and give us what. And we did the same thing here. Two weeks later we were sued. That's an answer to your question, two weeks. Two weeks later we were sued. And this was one of, I think it was four. But I think you were, as I understand it, you were already in litigation with, or at least your parent company was in litigation with Millennium on something else. They had already sued us in another matter, and I think they sued us in one or two more matters within the next two months. But okay, I'm out of time. You are out of time, and I have let you run over. Thank you both counsel. The argument was very helpful. The case is submitted for decision. Thank you. We'll take a ten-minute recess. All rise.
judges: Tallman, Friedland, Faber